**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Theophil Encalado (M38271), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22 C 5603 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| Wexford Health Source Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Theophil Encalado, an Illinois prisoner proceeding *pro se*, brings this civil rights action under 42 U.S.C. § 1983 alleging that two sets of Defendants: Lusecita Galindo, Kenneth Osborne, and LaToya Hughes (the IDOC Defendants); and Drs. Marlene Henze and Catalino Bautista, as well as Stateville Director of Nursing Smith (the Wexford Defendants) at Stateville Correctional Center were deliberately indifferent to his serious medical needs due to a delay in care between February 5, 2022, and June 9, 2022, when his right ankle brace broke, and his left leg prosthesis needed to be replaced. Plaintiff also alleges a violation of his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101, and Rehabilitation Act, 29 U.S.C. § 794, for denying him accommodation during the relevant time period. Currently before the Court are both sets of Defendants' motions for summary judgment. Dkt. 125, 129. For the reasons set forth below, the Court grants both motions for summary judgment.

## I. Summary Judgment Standard

### A. Federal Rule of Civil Procedure 56(a)

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

The party seeking summary judgment has the initial burden of demonstrating the "absence of evidence to support the non-moving party's case." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If this burden is met, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## B. Local Rule 56.1 (N.D. Ill.)

Local Rule 56.1 governs how to present and how to dispute facts in litigating motions for summary judgment in this District. *See* L.R. 56.1 (N.D. Ill.). Under Local Rule 56.1(a)(2), the moving party must provide a statement of material facts, and "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." L.R. 56.1(d)(2).

The opposing party must then respond to the movant's statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); L.R. 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain

how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3). The party opposing summary judgment may also submit "a statement of additional material facts," to which the moving party must respond in the same manner stated above. L.R. 56.1(b)-(c). A party's *pro se* status does not excuse him from complying with Local Rule 56.1. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

Although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) (unpublished), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record, or he could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently). The Court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

Additionally, Plaintiff's failure to strictly comply with Local Rule 56.1 is not a basis for automatically granting the Medical Defendants' motion. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Rather, the Court is mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The Court will apply these standards in evaluating the evidence.

## II. Background

### A. Procedural Background

Both the IDOC and Wexford Defendants filed their motions for summary judgment, along with a memorandum of law, a Local Rule 56.1(a) statement of material facts, and supporting

3

exhibits. Dkt. 125-127 and 129-135, respectively. As required by Local Rule 56.2, the Wexford Defendants also provided Plaintiff with a formal Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment. Dkt. 134.

Even so, Plaintiff's submissions do not comply with Local Rule 56.1. For example, while Plaintiff responded to the Wexford Defendants' statements of fact[1], *see* Dkt. 140, (Nonmovant Motion Opposing Movant Material Facts), Plaintiff admits to some of the statements of fact (para. 1-5), but in his attempts to dispute others he refers to groups of exhibits, generally, and states, for instance: "I object and I dispute it: all the same, why was this scheduling put off. See Exhibits A-B_D-E-F-G-H." (See Dkt. 140, pg. 2, ¶ 3.) The opposing party "must cite specific evidentiary material that controverts the fact[.]" N.D. Ill. L.R. 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003). Facts asserted by the moving party "may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3). Additionally, as the example cited makes clear, Plaintiff's attempts to dispute the statements of fact are argumentative or are legal conclusion, which the Court need not consider. ); *see also Almy v. Kickert Sch. Bus Line, Inc.,* No. 08-cv-2902, 2013 WL 80367, at *2 (N.D. Ill. Jan. 7, 2013) ("[C]ourts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact.'") (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 529 (7th Cir. 2000)).

The Court need not consider factual assertions that conflict with prior, sworn testimony, as well as hearsay statements, legal arguments and conclusions set forth as "facts," any declaration

---

[1] Plaintiff did not respond at all to the IDOC Defendants' statements of material fact, Dkt. 126.

that speculates as to other people's mindsets, and statements concerning matters about which only an expert could properly testify. *See Jones v. DeJoy*, No. 18 CV 1213, 2020 U.S. Dist. LEXIS 213569, 2020 WL 6716218, at \*1-2 (N.D. Ill. Nov. 16, 2020) (striking offending portions of Rule 56.1 statements that were "riddled with argument, unsupported assertions, and in some cases factual allegations beyond those set forth in the paragraph to which [plaintiff] was responding"); *Campbell v. City of Chi.*, No. 16 CV 6000, 2018 U.S. Dist. LEXIS 166119, 2018 WL 4637377, at \*1 (N.D. Ill. Sep. 27, 2018) ("Purely argumentative denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements.")

Plaintiff also submitted a statement of additional facts, Dkt. 142, which is really just a group of exhibits which Defendants have objected to and which do not comply with Local Rule 56.1 (b)(3)(C). Although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011) (unpublished), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record, or he could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently). The Court also keeps in mind that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond*, 442 F.3d at 608.

### B. Factual Background

Plaintiff Theophil Encalado ("Plaintiff") is in custody of the Illinois Department of Corrections ("IDOC"). He was housed at Stateville Correctional Center ("Stateville") from 2015 until September 19, 2024. (IDOC Defs SMF, Dkt. 126, ¶ 1.) Plaintiff's claims pertain to events between February 2022 and July 2022. (*Id.*) As a result of a 1996 gunshot wound, Plaintiff's left leg was amputated above the knee, and he uses a prosthesis. (*Id.* at ¶ 2.) Plaintiff also suffers from a

permanent "foot drop" condition in his right leg, resulting from nerve damage sustained in the same 1996 incident, and has worn a brace on his right foot since approximately 1996 or 1997 to provide "reflex and strength." (*Id.* at ¶ 3.) Prior to the incidents underlying Plaintiff's complaint, on September 23, 2020, Hanger Clinic ("Hanger") temporarily repaired Plaintiff's brace, noting that its padding had fallen off, screws were stripped and the ankle joint was broken. (*Id.* at ¶ 4.)

### *IDOC Defendants*

Defendant Lusecita Galindo served as the Healthcare Unit Administrator (HCUA) at Stateville from September 1, 2020, until approximately October 2022. (*Id.* at ¶ 6.) Defendant Galindo's role as HCUA at Stateville was strictly administrative, including overseeing HCU operations, ensuring policy compliance, directing and supervising IDOC staff and Wexford, monitoring reports, and reviewing/responding to medical requests and grievances according to established policies. (*Id.* at ¶ 14.) Although Defendant Galindo is a Registered Nurse by profession, her HCUA role was administrative, not clinical; she did not provide direct patient care, conduct medical assessments, diagnose conditions, prescribe medications, or provide treatments. (*Id.* at ¶ 15.) As HCUA, Defendant Galindo possessed no authority to order, procure, or expedite specialized medical equipment, such as prosthetic devices. (*Id.* at ¶ 16.) Such equipment requires a physician's order based on medical necessity and is managed through Wexford's clinical and supply channels, consistent with IDOC Administrative Directives ("AD") 04.03.101 and AD 04.03.103. (*Id.*)

Defendant Kenneth Osborne served as the Assistant Warden of Programs ("AWP") at Stateville from approximately February 2021 until April 2023. (*Id.* at ¶ 7.) Defendant Osborne's duties as AWP at Stateville were primarily administrative and supervisory, including oversight of various program areas, inmate grievances, and the general functioning and administration of the HCU. (*Id.* at ¶ 17.) Defendant Osborne is not a medical doctor, nurse, or licensed healthcare professional and

6

has no medical training beyond basic first aid. (*Id.* at ¶ 18.) His role related to the HCU was administrative oversight to ensure Wexford and the HCUA followed established procedures. (*Id.*) Defendant Osborne did not have the authority to order specific medical treatments or equipment, nor to direct medical staff on clinical matters. (*Id.* at ¶ 19.) Direct medical care, diagnosis, treatment decisions, ordering of medical equipment like prosthetics, and scheduling of outside medical appointments were the responsibility of licensed medical professionals employed or contracted by Wexford, per IDOC directives. (*Id.*) Defendant Osborne had no authority or ability to directly interact with external medical vendors, manage their timelines, or expedite their processes for medical equipment. (*Id.* at ¶ 20.) Plaintiff acknowledged that Defendant Osborne is not a medical professional and could not provide medical treatment, but believed Osborne could communicate his complaints to medical staff. (*Id.* at ¶ 21.) Defendant Osborne attested that in early to mid-2022, Stateville operations were significantly impacted by the COVID-19 pandemic, causing noticeable delays that could extend timelines for obtaining specialized medical equipment. (*Id.* at ¶ 66.)

During the relevant period, Defendant Rob Jeffreys was the Acting Director of IDOC.[2] (*Id.* at ¶ 8.) Plaintiff has never personally communicated with Defendant Jeffreys regarding his medical care or brace and named him in this lawsuit because Defendant Jeffreys was added by the Court as the proper defendant under the ADA and RA in his official capacity as the acting Director of IDOC. (*Id.*) *See* Dkt. 14 at 4.

*Wexford Defendants*

Dr. Marlene Henze is a physician licensed to practice medicine in Illinois. She was employed by Wexford Health Sources as the Medical Director at Stateville Correctional Center from

---

[2] Latoya Hughes is currently the Director of IDOC and is substituted as an IDOC Defendant for the official capacity claims against the IDOC Director pursuant to Fed. R. Civ. P. 25(d).

October 8, 2018, through December 15, 2023. (Wexford Defs SMF, Dkt. 131, ¶ 2.) At Stateville, her duties and responsibilities included assessing, examining, and diagnosing inmates, ordering diagnostic testing and/or imaging, and providing the appropriate medical treatment for any injuries, illnesses, ailments, or chronic medical issues. (*Id*.)

Dr. Catalino Bautista is and has been at times relevant to this case, a physician licensed to practice medicine in Illinois. (*Id*. at ¶ 3.) He was employed by Wexford Health Sources to provide services as a physician at several correctional facilities throughout the State of Illinois, including a period of employment at the Stateville Correctional Center from November 2018 to July 21, 2022, at which point he chose to voluntarily end full time employment with Wexford Health Sources and work for the Bureau of Prisons in California. (*Id*.)

Ms. Michelle Smith was, at all times relevant to this case, a registered nurse licensed in the State of Illinois, employed by Wexford Health Sources as a nursing supervisor for the Stateville Correctional Center in Joliet, IL ("Stateville") for the daytime shift, beginning November 11, 2019. (*Id*. at ¶ 4.) Thereafter, she was promoted to the Director of Nursing in either the summer of 2021 or during the year 2022, and she retained the role as Director of Nursing until May 2024, when she voluntarily ended her employment with Wexford and moved to the State of Texas. (*Id*.) As a nursing supervisor, Ms. Smith evaluated patients during the sick call process, which included recording subjective complaints, conducting objective examinations, providing predetermined protocol treatments, and/or referring patients to an on-site provider (*i.e.* a nurse practitioner or physician) for higher levels of care. (*Id*. at ¶ 5.) As the Director of Nursing at Stateville, Ms. Smith handled administrative matters that involved Wexford Health Sources, Inc. staff, which included interviewing; orientation; training; conducting annual reviews; discipline; tracking attendance, vacation, and

paid time off; and scheduling to ensure there were enough nurses to operate the Health Care Unit at Stateville. Her duties as Director of Nursing did not include direct patient care. (*Id*.)

While Ms. Smith was employed at Stateville, if an inmate patient raised a medical issue with her, her responsibility was to check his medical records to determine whether he had been seen by medical staff. (*Id*. at ¶ 8.) If the inmate had not been seen by medical staff, she directed nursing staff to triage the patient or otherwise provide protocol treatment. (*Id*.) If the inmate had already been seen by medical staff and/or a clinician, she would investigate to determine if the provider's care plan was being followed. (*Id*.) If it was not being followed or implemented, she would direct the nursing staff under her supervision to follow the care plan. (*Id*.)

Neither as a nursing supervisor nor as Director of Nursing did Ms. Smith have the ability or authority to override the care plan made by a provider, nor was she authorized to issue prescriptions, write referrals for medical services, make diagnoses of inmates, or prescribe specific medical treatment for inmates. (*Id*. at ¶ 9.) None of Defendants Henze, Bautista or Smith had a role in scheduling offsite appointments for inmates. (*Id*. at ¶ 7.)

*Relevant IDOC Administrative Directives*

IDOC Administrative Directive AD 04.03.101, "Offender Physical Examinations," states: "Medical or dental prostheses and orthodontic devices shall be provided when the health of the offender would otherwise be adversely affected as determined by the responsible physician or dentist." (IDOC Defs SMF, Dkt. 126, ¶ 9.) Administrative Directive 04.03.101 further provides that an offender's refusal of any examination shall be documented on the Medical Services Refusal, DOC 0083. (*Id*. at ¶ 10.) IDOC Administrative Directive 04.03.103, "Offender Health Care Services, outlines the procedure for offenders to obtain specialty services. (*Id*. at ¶ 11.) Pursuant to AD 04.03.103, if a facility physician, physician's assistant, or nurse practitioner (*i.e.*, Wexford

clinical staff at Stateville) deems specialty services necessary, a Medical Special Services Referral and Report (DOC 0254) is submitted to the Facility Medical Director (also Wexford). (*Id.* at ¶ 12.) If the Facility Medical Director approves the referral, it is then submitted to the healthcare vendor's (Wexford's) Utilization Management Unit for review. If the vendor approves, the Facility Medical Director ensures services are scheduled. If denied, the offender is notified in writing. (*Id.* at ¶ 13.)

*Plaintiff's Injuries and Medical Care*

On or about February 5, 2022, Plaintiff's right ankle brace broke when the hinge snapped while he was walking. (*Id.* at ¶ 22.) The broken brace was "pinching" and "cutting" his ankle, causing bleeding visible on his sock. (*Id.*) Plaintiff reported the broken brace to Wexford medical staff, specifically Dr. Catalino Bautista, on the same day or the day after the incident, during an "emergency sick call" in his housing unit, at which time Dr. Bautista visually inspected the broken brace. (*Id.* at ¶ 23.) Dr. Bautista documented the broken brace and told Plaintiff the brace needed to be sent out to be fixed as soon as possible. (*Id.* at ¶ 24.)

To the extent an inmate requires offsite medical services, under the Wexford-IDOC contract, the IDOC prefers that Wexford refer patients from correctional facilities in the Northern Illinois region to the University of Illinois at Chicago Hospital and its clinics for routine appointments and treatment. (Wexford Defs SMF, Dkt. 131, ¶ 6.) If an off-site service or appointment needs to be completed on an urgent basis, Wexford staff may arrange to send a patient to a local clinic for treatment, subject to that clinic's availability. (*Id.*) If a patient has a medical emergency, that patient is sent off-site to a local hospital without prior authorization from Wexford. (*Id.*) The scheduling of an inmate's appointments with off-site medical providers is done subject to the offsite provider's availability and security constraints. (*Id.* at ¶ 7.)

10

Promptly after the emergency sick call with Dr. Bautista, on February 7, 2022, Dr. Marlene Henze, a Wexford medical director, completed a Medical Special Services Referral and Report, marked "Urgent: Yes," referring Plaintiff to a "Local Orthotics" provider because his brace broke on February 5, 2022. (IDOC Defs SMF, Dkt. 126, ¶ 25.) On February 8, 2022, Dr. Catalino Bautista saw Plaintiff at his cell house to discuss a recent offsite visit to the UIC pain clinic for unrelated back pain. (Wexford Defs SMF, Dkt. 131, ¶ 12.) During this appointment, Bautista again discussed the fact that Plaintiff's brace for his right leg had broken. (*Id*.) Bautista referred Plaintiff to a local provider, the Hanger Clinic in Joliet, Illinois ("Hanger") for repair of his brace. (*Id*.)

On February 9, 2022, a medical permit was issued for Plaintiff to use a wheelchair. (IDOC Defs SMF, Dkt. 126, ¶ 26.) Without a functional ankle brace, Plaintiff was wheelchair bound because walking was so painful as to make it not possible. (*Id.*) Nevertheless, on February 10, 2022, Plaintiff refused a medical furlough to the University of Illinois Chicago Hospital ("UIC") for his broken brace. (*Id.* at ¶ 27.) Plaintiff's refusal was documented on a "Medical Services Refusal" form, which Plaintiff signed and was witnessed. (*Id.* at ¶ 28.) The form specified the refusal was for a "Medical Furlough for UIC" for Plaintiff's "broken foot brace." (*Id.*) In his deposition, Plaintiff confirmed that he signed the refusal form but testified that he did not recall refusing the furlough to UIC. *Id*. ¶¶ 27-28, Ex. 1 at 34:13-24.

In early March 2022, while Plaintiff was wheelchair-bound due to his broken right ankle brace, the wheelchair he was using broke while he was being wheeled to a class, causing him to fall and injure the stump of his left amputated leg. (*Id.* at ¶ 30 Following the wheelchair incident, Plaintiff's stump became swollen, hot, and painful; he developed a fever of 101.3°F and chills, and was in "serious" pain. (*Id.* at ¶ 31.) Plaintiff was admitted to St. Joseph's Hospital on March 9,

2022, after Dr. Henze at Stateville diagnosed him as suffering from edema and made an initial assessment that he had developed an abscess, and arranged for his hospitalization. (*Id.* at ¶ 32.)

Plaintiff was hospitalized at St. Joseph's Hospital from March 9, 2022, until his discharge on March 18, 2022. (*Id.* at ¶ 33.) During his hospitalization, an incision and drainage procedure was performed on Plaintiff's stump in the Emergency Department on March 9, 2022, after he was diagnosed with an abscess and cellulitis. (*Id.* at ¶ 34.) At the hospital, on March 10, 2022, Plaintiff tested positive for MRSA, a staph infection, and was treated with multiple IV antibiotics, including Rocephin, Vancomycin, Daptomycin, and Zosyn, which were adjusted based on his clinical response. (*Id.* at ¶ 35.) An MRI of his left lower extremity on March 15, 2022, ruled out osteomyelitis but showed a "small subcutaneous fluid collection." (*Id.*)

Plaintiff was discharged from St. Joseph's Hospital on March 18, 2022, with a peripherally inserted central catheter (PICC) line in place for continued antibiotic therapy. (*Id.* at ¶ 36.) Plaintiff's discharge plan from St. Joseph's Hospital included a 10-day course of IV Daptomycin and oral Levofloxacin, with IV antibiotics delivered to the prison, and wound care instructions. (*Id.* at ¶ 37.) Upon return to Stateville, Plaintiff continued IV antibiotics in the infirmary for approximately ten days and remained there until late June 2022. (*Id.*)

On April 5, 2022, while housed in the infirmary, Plaintiff submitted a grievance, stating his right ankle brace had been broken for two months, was causing pain, and requested it be fixed or that he be sent to Hanger. (*Id.* at ¶ 38.) Defendant Galindo received Plaintiff's April 5, 2022, grievance from a grievance officer on or around April 10, 2022; this was her first awareness of Plaintiff's broken brace, and she had not discussed it with him previously. (*Id.* at ¶ 39.) As acting ADA Coordinator for Stateville at that time, Defendant Galindo reviewed the grievance and determined the primary issue presented was medical, not ADA. (*Id.* at ¶ 40.) Consistent with her

administrative role, Defendant Galindo followed up on the grievance by meeting with Michelle Smith, the Wexford Director of Nursing at Stateville. (*Id.* at ¶ 41.) The Director of Nursing informed Defendant Galindo that Wexford medical staff were aware of Plaintiff's situation, he had been medically assessed, and arrangements were being made for the brace, specifically that he was being "sent out" for specialist consultation or prosthetic repair/fabrication. (*Id.* at ¶ 42.) Defendant Galindo relied upon the information from the Director of Nursing that Wexford was addressing the medical aspects of Plaintiff's situation and she had no further involvement in Plaintiff's issue with his broken brace. (*Id.* at ¶ 43.)

With regard to Plaintiff's medical problems with his infection in his left leg stump, Defendant Galindo was aware Plaintiff was housed in the Stateville infirmary, provided with a wheelchair, and understood crutches were ordered for him. (*Id.* at ¶ 44.) Plaintiff testified that while he was in the infirmary, Galindo occasionally walked through and greeted inmates and engaged in conversations with them about their complaints, to which she typically responded with general assurances that "I'll take care of it, you'll be fine, you'll get it." (*Id.*, Ex. 1 at 72-73). Plaintiff sent one request slip addressed to Defendant Galindo about the brace issue after the initial incident but received no direct written response from her. (*Id.* at ¶ 46.) The Administrative Review Board ("ARB") response dated June 29, 2022, to Plaintiff's grievance, incorporated information provided by Defendant Galindo via email on that date, stating that medical staff confirmed a brace was issued on June 9, 2022, and that additional supplies were provided to the grievant on June 24, 2022. (*Id.* at ¶ 47.) The ARB deemed the brace issue moot. (*Id.*)

On April 13, 2022, Plaintiff was referred by Wexford to Hanger for his brace to be made. (*Id.* at ¶ 48.) At Hanger on April 13, 2022, Plaintiff was evaluated for a new brace, a new brace was prescribed, and a cast was made for fabrication of the brace. (*Id.* at ¶ 49.) Also at Hanger on

April 13, 2022, Plaintiff was evaluated for his left leg prosthetic. (*Id.* at ¶ 50.) Due to shrinkage in volume of the stump and damage due to Plaintiff's fall, Hanger recommended a new prosthesis. (*Id.*) On April 20, 2022, an IDOC medical permit authorized Plaintiff's Hanger prosthesis and an IDOC medical permit for crutches was issued. (*Id.* at ¶¶ 51 and 54.) On April 20, 2022, Plaintiff was also issued medical permits at Stateville for a four-point walker, waist chains, state boots, daily showers, and for a slower paced walk during escorts by IDOC staff. (Wexford Defs' SOF, Dkt. 131, ¶ 18.)

On April 27, 2022, Plaintiff was taken back to Hanger and took delivery of his new custom fabricated right ankle brace. (IDOC Defs SMF, Dkt. 126, ¶ 52.) Medical notes indicate that Hanger noted the new brace fit and functioned appropriately. (*Id.*) Also on April 27, 2022, Hanger scanned and measured Plaintiff for a new left leg prosthetic socket. (*Id.* at ¶ 54.) Medical personnel at Hanger also noted that Plaintiff needed new shoes for stability and to accommodate his new brace. (Wexford Defs SMF, Dkt. 131, ¶ 20.) On May 3, 2022, Plaintiff was referred by Wexford to Hanger for his left leg prosthetic socket fitting. (IDOC Defs SMF, Dkt. 126, ¶ 55.) On May 20, 2022, Plaintiff attended another medical furlough to Hanger. (*Id.* at ¶ 56.) On May 25, 2022, Plaintiff was referred by Wexford to Hanger for a socket fitting check. (*Id.* at ¶ 57.) On June 9, 2022, Plaintiff attended another medical furlough to Hanger where they completed a socket fitting check and he separately took delivery of new accommodative shoes. (*Id.* at ¶ 58.)

On June 24, 2022, Plaintiff attended a subsequent medical furlough to Hanger and took delivery of his new left leg prosthesis. (*Id.* at ¶ 60.) Hanger noted the fit and function were optimal, though Plaintiff reported a "swishing noise," and a part was to be ordered. (*Id.*) On June 28, 2022, Plaintiff was referred by Wexford to Hanger for a prosthetic follow-up. (*Id.* at ¶ 61.) He attended a medical furlough and was again seen at Hanger on July 21, 2022, for adjustments to the left leg

prosthesis; after modifications, the Hanger Clinical Summary states Plaintiff "is now happy with px" and that he "tolerated the procedure without incident or problem." (*Id.*)

Other than Dr. Bautista, who is mentioned in Plaintiff's April 5, 2022 grievance concerning his leg brace (grievance #582), none of Plaintiff's grievances name the Defendants in relation to his complaints regarding his brace or his prosthesis. (*Id.* at ¶¶ 68-70.) Nor does Plaintiff's complaint contain specific allegations against IDOC Defendants regarding separate notifications or requests about program access denial distinct from the general consequences flowing from the brace issue. (*Id.* at ¶ 76.) During the relevant time period, Stateville had provisions, such as a designated yard area, for inmates with physical limitations. (*Id.* at ¶ 75.) Plaintiff admitted in his deposition that his inability to participate in programs like GED classes and yard activities can be attributed to his time in the infirmary due to his acute infection and recovery period. (Wexford Defs SMF, Dkt. 131, ¶ 30., and see Dkt. 126-1, pg. 22 (Pl. Dep. Pg. 81, ln. 11-13.)

### III. Analysis

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions of confinement," meaning they must "receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). To prove the Medical Defendants violated his right to receive constitutionally adequate medical care, Plaintiff must establish: (1) he "suffered an objectively serious medical condition"; (2) the Medical Defendants "knew of the condition and [were] deliberately indifferent to treating" it; and (3) "this deliberate indifference injured [Plaintiff]." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)); *see also Farmer*, 511 U.S. at 847 ("a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by

15

failing to take reasonable measures to abate it"). "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (citation omitted). The Seventh Circuit explained in *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013): "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of the failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." Where a prisoner contends that prison personnel "delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm," which means that the "plaintiff must offer medical evidence" showing that the delay was detrimental. *Id.* (citation omitted).

### A. Objectively Serious Medical Condition

An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (citations omitted). The condition "need not be life-threatening" but is considered serious if failure to treat the condition "would result in further significant injury or unnecessary and wanton infliction of pain." *Gayton*, 593 F.3d at 620; *see also Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

Viewing the facts in the light most favorable to Plaintiff, and because both sets of Defendants seem to concede this issue, the Court finds Plaintiff's amputated lower left leg and

right ankle "foot drop" condition constitute objectively serious medical conditions. It is undisputed that Plaintiff received ongoing care from doctors and other medical staff at his IDOC facility and that he was consistently referred to outside clinics for provision of a replacement brace and prosthetic limb. Additionally, at least one court has found that issues with a prosthesis that causes pain and sores that persist over several months constitute a "serious medical need," and this court will assume as much for the purposes of screening the plaintiff's complaint. *See Beasley v. Hairrs*, No. 10-cv-587-JPG, 2011 U.S. Dist. LEXIS 18793, 2011 WL 766980 at * 4 (S.D. Ill. Feb 25, 2011). Accordingly, for summary judgment purposes, the Court finds that Plaintiff suffered from objectively serious medical conditions.

### B. Deliberate Indifference

The Defendants argue they were not deliberately indifferent to Plaintiff's conditions and that to extent there might have been a delay in Plaintiff's receipt of his brace and prosthetic from Hanger Clinic, they had no personal involvement. There is no evidence that any Defendant knew of (and disregarded) a substantial risk of harm to Plaintiff. Deliberate indifference exists only if the defendant actually "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id*. Deliberate indifference poses an exacting standard requiring "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Stockton*, 44 F.4th at 615 (citation omitted). Neither "medical malpractice, negligence, [n]or even gross negligence … equate[s] to deliberate indifference." *Johnson v. Doughty*, 433 F.3d 1001, 1012-13 (7th Cir. 2006).

17

A treatment decision that is not "actually based on a medical judgment" can support an inference of deliberate indifference. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Likewise, "another type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016), as amended (Aug. 25, 2016). Of course, not every delay in a prisoner's medical treatment gives rise to a constitutional claim. Even outside of the prison setting, patients often must wait weeks or months for specialist appointments. "[W]hether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id*. In assessing a claim that a prisoner was subjected to treatment by medical professionals devoid of medical judgment, the court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

Plaintiff's claim in this case is in regard for the amount of time it took for his medical devices (ankle brace and prosthesis) to be replaced. The time-period in question is between February 7, 2022, when Defendant Dr. Henze became aware of the fact that Plaintiff's right ankle brace had broken and he was having pain and difficulty walking, and July 21, 2022, when Plaintiff was sent to Hanger Clinic for final adjustments for his left leg prosthesis. During this period, the only timing that anyone at Stateville could control was the time it took to request a furlough to an outside prosthetics provider, and the record demonstrates that request was made immediately, as a furlough to UIC was scheduled for February 10 and that Plaintiff refused that furlough. It is not clear ***why*** Plaintiff refused that furlough—perhaps he preferred the Hanger Clinic to UIC—but his claim of deliberate indifference cannot rest on a claim that he was not promptly furloughed to the

18

facility of his choice.

As of July 21, 2022, both of Plaintiff's medical devices had been replaced. The record establishes that between February 7, 2022, and July 21, 2022, Plaintiff saw medical personnel, including Defendants Doctors Henze and Bautista on February 7 and 8, 2022. Plaintiff was referred to Hanger Clinic for replacement of his brace. On February 9, 2022, he was provided with a wheelchair permit to assist him with his mobility issues. On February 10, 2022, Plaintiff was referred to UIC orthopedics for pain management, but Plaintiff refused the referral.

On March 9, 2022, Plaintiff was admitted to an outside hospital, after a fall, due to a broken wheelchair, and diagnosed with an abscess in his stump. He remained in the hospital until March 18, 2022, when he was released and placed in the Stateville infirmary until June 28, 2022. In spite of his complicated medical condition, Plaintiff was referred to the Hanger Clinic on April 13, 2022, for a casting for his new ankle brace, only two months after the brace broke and after Plaintiff had refused a furlough to UIC to address the broken brace. On the same day, medical personnel at Stateville made Plaintiff a referral for a follow-up appointment for when his brace was completed. On April 20, 2022, at Stateville, Plaintiff was issued multiple medical permits to address his comfort and mobility issues including equipment and accommodation (slower walks during transport).

On April 27, 2022, Plaintiff returned to the Hanger Clinic for receipt of his right ankle brace and for fabrication of a new left leg socket for his prosthetic. He was also fitted for replacement shoes. On May 3, 2022, Plaintiff was again referred to Hanger by Dr. Henze for additional follow-up treatment. This return trip occurred on May 20, 2022, when he was scanned and fitted for the left leg socket. On May 25, medical personnel again referred Plaintiff to Hanger for follow-up treatment that he received on June 9, 2022. Plaintiff received the left leg prosthetic

19

on June 24, 2022. Plaintiff received follow-up care at Hanger on July 21, 2022, for adjustments to the prosthetic.

Considering this totality of medical care Plaintiff received, there was plainly no Eighth Amendment violation here. *See Riley*, 126 F.4th at 1296 (affirming summary judgment for prison medical professionals based on totality of care despite prison physicians' minor deviations from specialist's recommendations); *Kyles v. Williams*, 679 F. App'x 497, 499-500 (7th Cir. 2017) (prison medical professionals were entitled to summary judgment because a series of appointments and reasonable medical attention for prisoner's knee issues demonstrated that providers did not consciously disregard a serious risk of harm); *Wilson v. Adams,* 901 F.3d 816, 821–22 (7th Cir. 2018) (affirming grant of summary judgment on claim of deliberate indifference where "totality" of care showed proper attention to inmate's pain).

The record does not establish any delay in treatment, and Plaintiff's allegations seem to merely express dissatisfaction with the amount of time it took Plaintiff to receive his replacement medical devices. However, even if there were any evidence of delay, there is no evidence that any Defendant, medical or administrative, had any control over the fabrication and delivery of Plaintiff's devices at the Hanger clinic. What IDOC and Wexford personnel *could* control was care at Stateville and referral to the outside clinic. All of which, based on the record were timely and thorough.

Additionally, to the extent Plaintiff asserts a delay in treatment amounting to a constitutional violation, Plaintiff points to no evidence suggesting that he would have been seen sooner, more effectively, or efficiently by any orthopedic specialist anywhere. Accordingly, there is no reason to believe that Plaintiff's medical outcome or level of pain would have been any different had he been referred to a different clinic or specialist during the relevant time period. *Thomas v. Chmell*,

20

747 F. Supp. 3d 1137 (2024) (Bucklo, J.) Because the record establishes a finding that the totality of care provided to Plaintiff belies any notion of deliberate indifference, the Court finds that the medical Defendants Henze and Bautista are entitled to summary judgment. With respect to the remaining Defendants who were in security or administrative roles, Galindo, Osborne, and Smith, because the record establishes no deliberate indifference by the medical defendants on the basis of the totality of care provided, and, as administrators, they are entitled to rely on the care given by medical professionals, they are also entitled to summary judgment. *See, e.g., Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care"); s*ee also Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (fact that medical staff was addressing prisoner's medical needs insulated the warden from liability). Accordingly, the Court finds that the totality of care provided to Plaintiff negates any claim of deliberate indifference, and although administrators may have received complaints from Plaintiff, those administrators were entitled to rely on the medical personnels' provision of adequate care. The Court, therefore, grants summary judgment to all Defendants on any claim of deliberate indifference.

### C. ADA/Rehabilitation Act

Plaintiff makes a claim under the Americans with Disabilities Act against the Director of the Illinois Department of Corrections.[3] Under the Americans with Disabilities Act, an individual cannot be denied access to services or otherwise subjected to discrimination because of his disability. 42 U.S.C. § 12132. Under the Act, "no qualified individual with a disability shall, by

---

[3] Rob Jeffreys was the Director at the time and has since been replaced by present Director Latoya Hughes.

reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a violation, a plaintiff must show "he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability." *Hildreth v. Butler*, 960F3d. 420, 430-431; citing *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal quotations omitted).

Similarly, Section 504 of the Rehabilitation Act (RA) provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "The relief available under the ADA and Rehabilitation Act is coextensive." *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cir. 2012). To prevail on either an ADA or an RA claim, James must ultimately show that "(1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability." *Id.* at 672. "It is well established the refusing to make reasonable accommodations is tantamount to denying access." *McDaniel v. Syed*, 115 F.4th 805, 823 (7th Cir. 2024) (quoting *Jaros*, 684 F.3d at 672) (cleaned up).

The availability of "coextensive" relief under the ADA and the RA is significant because the IDOC may be immune from suit under the ADA pursuant to the Eleventh Amendment, but Illinois has waived its sovereign immunity under the Rehabilitation Act because it, like all states, accepts federal funds for its prison system. *Jaros*, 685 F.3d at 671-72; *see also McDaniel*, 115 F.4th at 821 n.9. For now, the Court can "dispense with the ADA and the thorny question of sovereign immunity" since James can just as well pursue his failure-to-accommodate claim under the RA,

and, in any event, he "can have but one recovery." 685 F.3d at 672.

The ADA imposes a duty to provide reasonable accommodations to disabled persons. 42 U.S.C. § 12182(b)(2)(A)(ii) ("[D]iscrimination includes ... a failure to make reasonable modifications in policies, practices, or procedures."); *Hildreth*, 960 F.3d at 431, citing *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018). To receive compensatory damages, Plaintiff must show deliberate indifference, which occurs when defendants "knew that harm to a federally protected right was substantially likely and ... failed to act on that likelihood." *Id.* and *see Lacy v. Cook Cty.*, 897 F.3d 847, 862 (7th Cir. 2018) (*quoting Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344 (7th Cir. 2012)).

Plaintiff's ADA/Rehabilitation Act claim mirrors his deliberate indifference claim, as he alleged that the defendants discriminated against him by failing to provide proper care for his condition, resulting in an inability to attend GED classes, the yard, and to shower properly. As already discussed, though, the evidence does not support those allegations. To the contrary, the evidence shows that Plaintiff received adequate treatment and care during his incarceration. It further indicates he was accommodated with medical devices, including a wheelchair, crutches, and a four-point walker, as well as permits to assist with daily activities, including movement and showers. The record establishes that during the five months in question, Plaintiff suffered a major infection, requiring hospitalization, and subsequent long-term placement in the prison infirmary, that would have curtailed his access to any programs he might have wished to attend or participate in.

Plaintiff's allegation is not that he was treated worse because he was disabled; rather it is that he received inadequate medical care (delay) that resulted in his inability to participate in programs. However, the Seventh Circuit Court of Appeals rejected this type of use of the ADA as a statute

meant to combat medical malpractice. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996.) While there is evidence that Plaintiff complained to administrators by way of grievances regarding access to programs, there is also evidence that there were attempts made to accommodate him, and that his access to programs was in fact limited based on his medical condition, not any failure to accommodate, or due to discrimination. Because Plaintiff has not presented any evidence that he was deprived of any rights guaranteed by the ADA, and the record does reflect an attempt to accommodate Plaintiff based upon his disability, no reasonable juror could find for him on that claim. The Court therefore grants summary judgment on Plaintiff's ADA claim as well.

### IV. Conclusion

For the foregoing reasons, the Defendants' motions for summary judgment (Dkt. 125 and 129) are granted. Final judgment will be entered in favor of all Defendants. If Plaintiff wishes to appeal, he must file a notice of appeal with this court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1)(A). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this court stating the issues he intends to present on appeal. *See* Fed. R. App. P. 24(a)(1).

Date: March 19, 2026

John J. Tharp, Jr.
United States District Judge

24